IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| YANCEY EZRA SHERIDON BAILEY, #371319 | * |
| v. | *  CIVIL ACTION NO. CCB-13-2974 |
| WEXFORD MEDICAL SERVICE | * |

\*\*\*\*\*

# **MEMORANDUM**

On October 9, 2013, the court received this 42 U.S.C. § 1983 complaint from Yancey Ezra Sheridon Bailey, an inmate housed at the Allegany County Detention Center in Cumberland, Maryland. Bailey contends that while housed at a Maryland prison in July 2013, he twice cut his right wrist, was refused the ability to obtain "proper medical treatment" at an outside hospital, and was only provided sutures by an in-prison nurse. (ECF No. 1, at 4, 5.) He claims that when seen by a hospital physician one week later, he was told that nothing could be done, but was referred to a plastic surgeon. Bailey states he could not feel his finger. (*Id*. at 5.) He seeks plastic surgery, along with $1,500,000.00 in compensatory and punitive damages. (*Id*. at 3.)

The defendant, Wexford Medical Service ("Wexford"), has filed a motion to dismiss or, in the alternative, motion for summary judgment, as well as a motion to seal. Bailey was notified of his rights and obligations to file responsive pleadings pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and granted an extension of time to do so, (*see* ECF Nos. 14, 16, 17), but has not filed opposition materials. No hearing is needed to resolve the issues presented. *See* Local Rule 105.6 (D. Md. 2014). For reasons to follow, Wexford's dispositive motion, treated as a motion for summary judgment, will be granted, and Wexford's motion to seal will be granted in part and denied in part.

## BACKGROUND

Bailey's medical history includes asthma, diabetes, and chronic obstructive pulmonary disease. (Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J., ECF No. 13-4, at 1-3.) He also suffers from chronic obesity, hyperlipidemia, borderline personality disorder, psychosis, and hyperthyroidism. (*Id.*) On June 24, 2013, Bailey was seen for a mental health screening at the Maryland Reception & Diagnostic Center ("MRDCC"). He had received mental health medications such as Celexa, Valproic Acid, Depakote ER, and Ativan Perphenazine[1] when confined in the Department of Public Safety and Correctional Services from 2006 to 2013. (*Id.* at 7.) Bailey had attempted suicide while incarcerated in 1999 and 2009. (*Id.*)

On June 26, 2013, Bailey was seen by a nurse for a health assessment. (*Id.* at 10-13.) He was found to be in no acute distress and was scheduled to be seen in the Chronic Care Clinic ("CCC"). The following day on June 27, 2013, Bailey filed a sick-call claim alleging he hurt his right arm doing pushups. (*Id.* at 14.) He was seen by Nurse Andrea James, who found Bailey alert and oriented. No acute distress was noted and Bailey was able to move his fingers without difficulty. He was given an ice pack and Naproxen[2] for discomfort. (*Id.*)

On June 28, 2013, Bailey was seen by Nurse Roslyn Deshields in response to his claim that he had been sexually assaulted the previous night. (*Id.* at 15.) No visible signs of bruising were observed, but he was transferred to Mercy Hospital for examination. He was seen for the alleged sexual assault and right arm pain, which he attributed to several plates placed in his arm due to a fracture he had experienced a few years earlier from flying through a windshield in a car accident. (*Id.* at 205-22.) The only finding noted by medical personnel was of tenderness to Bailey's right

---

[1] These medications are primarily used to treat depression or mania related to bipolar disorder. *See* www.nlm.nih.gov.
[2] Naproxen is an anti-inflammatory drug used to relieve mild pain. *See* www.nlm.nih.gov.

arm. An x-ray was performed of his right forearm, which showed no abnormalities except for the plate hardware noted by Bailey during his examination. (*Id*.)

On June 29, 2013, however, Bailey was seen by Physician's Assistant (PA) Chukwuka Bosah at MRDCC because he had attempted suicide by using a razor from his hygiene kit to cut a five centimeter superficial laceration into the radial region of his right hand. (*Id*. at 19-23.) He stated he was suicidal because he had been sexually assaulted by his cellmate and he acknowledged suicidal ideation and prior attempted suicides. Moderate bleeding was revealed. The psychology department was notified and it ordered Bailey placed in the Inpatient Mental Health Unit ("IMHU") with only a smock and mattress. He was to be seen by the IMHU psychiatrist. Bailey received sutures for his wound. (Aff. of Dr. Thomas Ottey, ECF No. 13-5, ¶ 6.)

On July 1, 2013, Bailey was seen by a PA in the IMHU for a health assessment. (ECF No. 13-4, at 24-26.) Aside from the laceration to his wrist and the accompanying sutures, his condition was found to be stable. The next day, he was seen by a nurse after stating he had back pain due to a recent fall. (*Id*. at 27-28.) No note was made that he complained of any wrist pain. On July 3, 2013, Bailey was transferred back to MRDCC at 8:00 p.m. At intake, his right inner wrist was observed to be reddened and swollen, and the suture area was weeping. (*Id*. at 29.) On July 4, 2013, a nurse saw him after he injured his right hand by hitting his cell wall. (*Id*. at 30-31.) His right knuckle was swollen and tender with skin abraded off in a one-inch circle. Bailey was informed that due to the fact there were no mid-level personnel available, a visit would be scheduled the next day. His hand was wrapped in an ACE bandage and he was given Motrin and an ice pack. Four hours later, Bailey was seen by a nurse due to his complaint that in the IMHU the previous day, another inmate held a "shank" to Bailey's neck while sexually assaulting him. (*Id*. at 32.) Bailey had no bruises or marks on his throat. He was placed in protective custody.

On July 5, 2014, Bailey was seen by Nurse Carolyn White for an unscheduled visit due to this allegation of sexual assault. (*Id*. at 33.) No objective or subjective physical trauma was noted and Bailey did not complain of pain. He was later transported for an examination at Mercy Hospital, where he was seen by Dr. Semhar Tewelde, who observed that Bailey had a right-side forearm and hand splint which was intact. (*Id*. at 223-30.) It was noted that Bailey had been treated the previous week for a prior reported sexual assault and had also been treated for a "boxer's fracture" for which he had been given a splint.

Upon his return from Mercy Hospital, Bailey complained of pain in his right hand from "shadow boxing" in his cell the previous night and hitting the wall. (*Id*. at 36-38.) His right hand was observed to have a mildly reduced range of motion. His sutures were intact, but the area was inflamed. No drainage was observed. He was given anti-bacterial ointment, an ice pack, and pain medication. Nurse Deshields ordered a follow-up x-ray of Bailey's right hand and wound care so Bailey would be treated daily with a topical ointment and sterile dressing. (*Id*.)

On July 9, 2013, Bailey was seen by Dr. Virendra Chhunchha to review the x-rays of his right hand and forearm. (*Id*. at 42.) No acute fracture was noted and he was advised to continue his wound care and to avoid self harm. The following day, Bailey was again seen by Dr. Chhunchha in the CCC. (*Id*. at 44.) The physician noted Bailey's stitches were ready to be removed. (*Id*. at 44-47.) Bailey's swelling had reduced, the area was healing well, and the range of motion was good. The stitches were removed without difficulty and a topical antibacterial ointment was applied. (*Id*.)

On July 12, 2013, however, Bailey was seen for an unscheduled nursing visit for cutting his wrist with a razor in the same place as his previous attempt on June 29, 2013.[3] (*Id*. at 48.) The wound was deeper on this occasion and roughly four inches in diameter. (*Id*. at 48-49.) The wound

---

[3] Bailey indicated to the nurse that he did not want to live because a 25-year sentence had been imposed on

4

was cleaned and sterile strips and a dry dressing were applied to the site. Medical staff was informed that Bailey was not to be left alone and was to remain in the presence of a staff member until all evaluations were completed. He was medically cleared later that day after sutures were placed in his wrist, and was also cleared by the psychology department to be transferred to the IMHU. (*Id*. at 50-52.) When seen in the IMHU for medical clearance on July 14, 2013, Bailey indicated he was suicidal and had swallowed two razors during that day's lunch. (*Id*. at 53-55.) The physical examination was within normal limits, but a follow-up x-ray was ordered to determine if Bailey had in fact swallowed any foreign objects. (*Id*. at 54.) He was to be continued on IMHU housing, was cleared for psychological evaluation, and his wrist wound was to be treated twice daily.

On July 15, 2013, Bailey was seen by a PA. A preliminary x-ray ruled out any razor in the colon and Bailey reported passing the plastic-contained razors without any colon or bowel irritation. (*Id*. at 56-57.) Upon examination of his wrist, it was observed that Bailey's sutures were loose. Sterile strips were applied to the wound, to be removed after 10 days and dressing changes were to be performed daily. Antibiotic and prophylactic treatment was to be given to prevent infection. (*Id*.)

On July 18, 2013, Bailey was transferred back to MRDCC from the IMHU. His medical record was reviewed and he was placed on segregation without medical observation. (*Id*. at 58.) The psychology department was, however, notified of his return. On July 20, 2014, Bailey submitted a sick-call slip asking to be seen for his right wrist. (*Id*. at 169.) He was seen that day by a nurse, who observed that Bailey was bleeding from his right wrist. A cut measuring 3 centimeters by .5 centimeters was observed on Bailey's wrist. He stated he cut himself because his stress level was high, but had decreased after he had reopened his wound. (*Id*. at 59-61.) The wound was cleaned, and an antibiotic ointment and bandage were applied. Bailey refused sterile strips. The on-call

---

him that day. (ECF No. 13-4, at 48.)

psychiatrist was notified. Bailey was transferred back to the IMHU. The following day he was seen by a PA for the intentional reopening of self-inflicted wrist wound. (*Id*. at 60.) The PA noted Bailey had intentionally detangled the sutures in his wrist and had removed the sterile strips. The wound was treated with antibiotic ointment and gauze. (*Id*.) On July 22, 2013, Bailey was transferred to Mercy Hospital after reporting another sexual assault.[4] (*Id*. at 63.) He complained of numbness and pain in his wrist due to a reopening of the wound. (*Id*. at 231-32.) Upon examination, the wrist had a 6 centimeter open wound with a scab growing in the center. An active range of motion was observed. It was recommended that Bailey see a hand specialist. (*Id*.)

Upon his return from Mercy Hospital on July 23, 2013, Bailey was seen by a prison nurse, who observed a clean, dry, and intact dressing on his right wrist. (*Id*. at 65.) When the dressing was lifted for observation, it was noted that the center of the wound was pink and there was drainage emitting from the site. (*Id*. at 65-66.) Bailey was to follow up with Mercy Hospital's plastic surgery unit in two days. Later that same day he was seen by another nurse at MRDCC due to his transfer from the Metropolitan Transition Center. (*Id*. at 67-69.) His wrist wound was cleaned and dressed.

Later on July 23, 2013, Bailey arrived at the Western Correctional Institution ("WCI"). (*Id*. at 70, 74.) He admitted to suicidal ideations and complained of right hand pain. Two days later he was seen by Nurse Tiffany King for his complaints of losing feeling in and use of his right hand. (*Id*. at 72-73.) No signs or symptoms of infection were noted. On July 26, 2013, Bailey was seen by a nurse in light of his recent transfer from MRDCC. (*Id*. at 74-76.) It was observed that he had a right wrist dressing that was changed daily. He reported an inability to move fingers at all on his right hand since the self-mutilation, but was able to move and flex his wrist. He did not report pain at the site of the laceration. No signs of infection were noted. Bailey indicated he was to see a nerve and

---

[4] Bailey admitted in his complaint that he fabricated the story of sexual assault so that he would be taken to the

6

hand specialist at MRDCC prior to his WCI transfer. He was scheduled to be seen by a physician within one week for reported immobility of his right hand. A plastic surgeon consult was also placed. (*Id*.)

On July 31, 2013, a physical therapy ("PT") consult was ordered for Bailey to evaluate his right hand immobility. (*Id*. at 79.) On August 1, 2013, he was approved for PT. (*Id*. at 79-80.) Over the next week Bailey was seen by nurses for dressing changes to his right wrist wound. (*Id*. at 82-85.) No signs or symptoms of infection were noted. On August 22, 2013, he was seen for a PT evaluation. (*Id*. at 239-40.) The lacerated area was observed to be healed and Bailey's passive range of motion for his right wrist was within normal limits. No atrophy was observed and there was no observable injury to the median or radial nerve distributions.

Bailey continued receiving PT. (*Id*. at 239-50.) It was observed that the active range of motion in his fingers and thumb was within normal limit and he had full thumb opposition. (*Id*. at 249.) The record shows that while seen by medical personnel in the latter portion of September and early October 2013, Bailey voiced no complaints regarding his right wrist. (*Id*. at 86-98.) On October 10, 2013, he was seen by a nurse for an evaluation as to the need for further PT. (*Id*. at 99-100.) It was determined PT would continue for another six sessions. (*Id*.) On October 28, 2013 Bailey was seen by a nurse for his complaints of a swollen right hand, sustained from punching the wall when he became angry. (*Id*. at 103-05.) An x-ray was ordered and a follow-up appointment was scheduled. On November 4, 2013, Bailey was seen by Nurse Mahler to review his x-ray results. No evidence of an acute fracture, dislocation, or subluxation was found. (*Id*. at 109-10.)

On November 9, 2013, Bailey was seen for a possible overdose of the anti-inflammatory medications Robaxin and Naproxyn. (*Id*. at 111.) He was placed in a suicide smock in an

---

hospital. (ECF No. 1, at 4.)

7

observation room. Bailey complained of his discontinued PT and of right arm pain, but no injuries were observed. (*Id*. at 111-17.) On November 15, 2013, Bailey was seen by Dr. Ava Joubert for a follow-up visit in regard to his discharge from the infirmary. (*Id*. at 127-28.)

On December 8, 2013, Bailey was seen by Nurse Karen Meyers because he had once again cut his right wrist. (*Id*. at 134.) He was placed on suicide precaution. Sterile strips were placed on his wrist. Later that day, Dr. Colin Ottey placed 11 staples in Bailey's arm to close the wound. Dr. Ottey noted Bailey had decreased extension of the second through fifth fingers on his right hand and he was unable to make a fist. (*Id*. at 134, 139-42.) Three days later, Bailey was seen for a PT session, which was resumed due to his new injury. (*Id*. at 251.) Throughout the next month, Bailey continued PT and was seen by prison physicians. (*Id*. at 151-53, 158-59, 161, 260, 263-64, 267.) Bailey was observed to have improved range of motion in the fingers of his right hand; his wound was found to be clean and dry, with no observable evidence of infection; and with the staples removed and antibiotic ointment applied to the area, the laceration appeared to be healed. (*Id*.) Bailey had several PT sessions in late December 2013. (*Id*. at 260-62.) On January 7, 2014, PT sessions were recertified. (*Id*. at 263.) Though Bailey complained of "ten out of ten" pain, he was able to move his hand and stretch it as well. (*Id*. at 265.) The following day when seen by a physical therapist, Bailey indicated his pain was low. (*Id*. at 263-65, 267.)

## ANALYSIS

### I. Wexford's Motion to Seal

Wexford has filed a motion asking that its motion to dismiss or, in the alternative, motion for summary judgment, along with the attached exhibits, be placed under seal due to the sensitive nature of the medical materials. (Def.'s Mot. to Seal, ECF No. 18.) Plaintiff has not filed an opposition.

Local Rule 105.11 (D. Md. 2014), which governs the sealing of all documents filed in the record, states in relevant part:

> Any motion seeking the sealing of pleadings, motions, exhibits or other documents to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection.

The Rule balances the public's common law right to inspect and copy judicial records and documents, *see Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), with competing interests that sometimes outweigh the public's right, *see In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984). The common-law presumptive right of access can only be rebutted by showing that countervailing interests heavily outweigh the public interest in access. *Doe v. Public Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014). The public's right of access to dispositive motions and the exhibits filed within is protected to an even higher standard by the First Amendment. *See Rushford v. New Yorker Magazine, Inc.,* 846 F.2d 249, 253 (4th Cir. 1988). This right also "extends to a judicial opinion ruling on a summary judgment motion." *Public Citizen*, 749 F.3d at 267. The First Amendment's right of access "may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'" *Id.* at 266 (citation omitted). "[S]ensitive medical or personal identification information may be sealed," but not where "the scope of [the] request is too broad." *Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011).

Wexford argues that though Bailey has placed his medical information at issue in this case, Wexford's motion and its attached exhibits, which include Dr. Ottey's affidavit, (ECF No. 13-5), and hundreds of pages of Bailey's medical records, (ECF No. 13-4), should be shielded from public view. (Def.'s Mot. to Seal, at 1.) Wexford further argues that the motion and its exhibits "could not

9

be redacted without eviscerating the purpose of the [m]otion" and without harming Wexford's ability to present an adequate defense to Bailey's medical claims. (*Id.* at 2.)

The court agrees that Bailey has placed his medical information at issue by asserting in his complaint that he repeatedly cut his own wrist and then fabricated a story of sexual assault so that he would be taken to a hospital to receive proper medical treatment. The court must therefore look to, and rely on, the medical records surrounding his treatment. But given the quantity of personal medical information in the medical records that is unrelated to the issues in this case, and the fact that this information is scattered throughout the records, Bailey's interest in sealing the full medical records is compelling. In contrast, the factual information referenced in Wexford's memorandum in support of its motion to dismiss or, in the alternative, motion for summary judgment, is inextricably tied to the issues in this case, as is the factual information in Dr. Ottey's affidavit. In order to narrowly tailor the denial of access to serve Bailey's compelling interest in not making public a large amount of medical information unrelated to his claims, the court grants Wexford's motion to seal as to the medical records, (ECF No. 13-4), but denies the motion as to both Wexford's memorandum in support of its motion to dismiss or, in the alternative, motion for summary judgment, (ECF No. 13-3), and Dr. Ottey's affidavit, (ECF No. 13-5).

**II. Wexford's Motion to Dismiss or, in the Alternative, for Summary Judgment**

Wexford has moved to dismiss or, in the alternative, for summary judgment. "'The purpose of a Rule 12(b) (6) motion [to dismiss] is to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli,* 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted). A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts the plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "'accept[ ] as true

10

the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff.'" *Brockington v. Boykins,* 637 F.3d 503, 505 (4th Cir. 2011) (citation omitted).

Ordinarily, a court cannot consider matters outside the pleadings or resolve fact disputes when ruling on a Rule 12(b)(6) motion. *Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

"There are two requirements for a proper Rule 12(d) conversion." *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013). First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious"). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Greater Baltimore*, 721 F.3d at 281 (quoting *Gay*, 761 F.2d at 177).

Both requirements are satisfied here. First, Bailey was made aware that material outside the pleadings was before the court because Wexford's motion included a number of exhibits, including

Bailey's medical records. Second, Bailey was afforded a reasonable opportunity for discovery, a fact made more evident by the court's grant of his motion for extension of time to file a response. Accordingly, Wexford's motion shall be treated as a motion for summary judgment, and the court will consider Wexford's attached materials.

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002). At the same time, the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal quotation marks omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Bailey's medical claim shall be examined in light of this standard.

**ANALYSIS**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions or inaction of the defendants amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Correctional Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001).

Because "the essential test is one of medical necessity and not simply that which may be considered merely desirable," inmates do not have a constitutional right to the treatment of their choice. *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).  Disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury.  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see also Fleming v. LeFevere*, 423 F. Supp. 2d 1064, 1070-71 (C.D. Cal. 2006).

Bailey has been asked to rebut Wexford's medical exhibits and affidavit with his own evidence to establish a genuine dispute of material fact as to whether Wexford acted with deliberate indifference to his serious medical needs.  He has not done so.[5]  Assuming Bailey presented a serious medical need, and viewing the evidence in the light most favorable to him, no question of fact exists as to the sufficiency of his medical care under the Eighth Amendment.  Bailey was repeatedly seen by nurses, PAs, therapists, and doctors for his multiple acts of self-mutilation causing injury to his wrist, hand, and arm.  He received sutures, staples, anti-inflammatory medications, dressings, and antibiotics in oral and topical form.  Indeed, the PT received by Bailey appeared to be helpful.  At most, Bailey's complaint alleges he is not satisfied with the treatment plan provided by healthcare staff.  But the fact that he received PT sessions, rather than the plastic surgery he seeks, does not demonstrate deliberate indifference to a serious medical condition.  *See Bowring*, 551 F.2d at 48; *Wright*, 766 F.2d at 849.  He does not allege Wexford had a culpable state of mind and failed to provide him with constitutionally sufficient treatment.  In short, the fact that Bailey did not receive the consults of his choosing does not give rise to an Eighth Amendment claim.

---

[5] To the extent the complaint names Wexford for the alleged denial of medical care solely upon vicarious liability, "§ 1983 liability is not available under the doctrine of *respondeat superior*." *West v. Atkins*, 487 U.S. 42, 54 n.12 (1988).  Wexford would also be entitled to judgment for this reason.

## CONCLUSION

For the reasons stated above, Wexford's motion for summary judgment will be granted, and its motion to seal will be granted in part as to Bailey's medical records. Wexford's motion to seal will be denied in part as to its memorandum in support of its motion to dismiss or, in the alternative, motion for summary judgment, and as to Dr. Ottey's affidavit. Judgment will be entered in favor of Wexford by a separate order which follows.


Date: <u>September 10, 2014</u>               <u>        /s/                    </u>
                                         Catherine C. Blake
                                         United States District Judge